# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>920 LOCKE STREET,<br>SALISBURY, NC 28144 | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:24MJ 13 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;

- ☑ contraband, fruits of crime, or other items illegally possessed;

- ☑ property designed for use, intended for use, or used in committing a crime;

- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Drug Distribution and Conspiracy |
| 21 U.S.C. § 843 | Use of Communication Facility |
| 18 U.S.C. § 1956 | Money Laundering and Conspiracy |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.

- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Chad Pupillo, Special Agent, FBI

*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 01/10/24

*Judge's signature*

City and state: Greensboro, North Carolina

L. Patrick Auld, U.S. Magistrate Judge

*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

### ("Subject Premises")

This warrant applies to the residence and buildings located at 920 Locke Street, Salisbury, North Carolina 28144. The residence is a two-family (duplex) residence located on a two-lane road. The duplex is numbered 922 for the left unit and 920 for the right unit which has an outer storm door with glass over a white bottom, and an inner door. The residence has white siding. This warrant applies to 920 (right unit). This warrant applies to any vehicle located on the premises associated directly to 920 (right unit).



## ATTACHMENT B

## Particular Property to be Seized

All property, items, records, and information relating violations of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, 21 U.S.C. § 843(b), 18 U.S.C. § 1956, located at the **Subject Premises** described in Attachment A, that constitute evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, or instrumentalities of these crimes, committed by or involving Kenneth Thomas CARROLL II, in the form of:

a. Drugs, drug paraphernalia, drug packaging materials, used in furtherance of the drug conspiracy;

b. Bulk cash derived from the trafficking of drugs in furtherance of the drug conspiracy;

c. Firearms, ammunition, and firearm accessories that constitute evidence of, or instrumentalities of, the Subject Offenses as follows:

d. Documentation of ownership, purchase, or procurement of real property purchased with illicit funds derived from drug transactions;

e. Documents and any other indicia of ownership or control over the **Subject Premises**;

f. Documents and any other indicia of ownership or control over cellular phones and electronic devices found at the **Subject Premises**;

g.   Physical documents, papers, or receipts for purchases of goods, relating to money laundering of drug funds to include financial records and accounts;

h.   The seizure of the cell phones belonging to CARROLL and located at the **Subject Premises**, that could be used to save or store digital videos, photographs, electronic documents, or social media content consistent with drug trafficking activities;

i.   The seizure of cellular telephones or cellular smartphone devices with the capability of placing and receiving voice calls and text messages for the purposes of transacting drugs, and the search of those devices (hereinafter "CELL PHONE") for the following evidence:

   i.   Evidence of communications in the form of calls and text messages (SMS, MMS), encrypted applications with stored messaging, and social media direct messages consistent with drug trafficking activities.

   ii.   Evidence of who used, owned, or controlled the CELL PHONE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

iii. Evidence of the attachment of the CELL PHONE to computers or other electronic storage devices for electronic data or information;

iv. Documentation and manuals that may be necessary to access the CELL PHONE or to conduct a forensic examination of the CELL PHONE;

v. Records of or information about Internet Protocol addresses used by the CELL PHONE, and records of or information about the CELL PHONE's connections to any Wi-Fi sources located at the **Subject Premises**.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT FOR 920 LOCKE STREET, UNIT B (RIGHT UNIT), SALISBURY, NC

I, Chad Pupillo, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since March 2009. As such, I am a "Federal Law Enforcement Officer" of the United States.  My duties include the investigation of violations of federal criminal law throughout the Middle District of North Carolina, including Salisbury, North Carolina.  Since my employment, I have been assigned to and participated in numerous Organized Crime Drug Enforcement Task Force (OCDETF) investigations. Through formal and on the job training, I have developed experience in investigations dealing with DTOs and drug offenses set forth in the United States Code.

2.      As an FBI Special Agent, I am authorized to investigate violations of federal law and to execute warrants issued under the authority of the United States. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of telephones and their use of numerical codes and code words to conduct their transactions.  I am familiar with practices used by traffickers involving the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds, including the language and terms that are used to disguise the source and nature of the profits from their

illegal narcotics dealing. I have participated in investigations involving the use of electronic surveillance techniques to include, but not limited to, court-authorized wire intercepts; video surveillance; global positioning satellite ("GPS") trackers; and body-worn monitoring devices. These investigations have included violations of statutes listed under Titles 18 and 21 of the United States Code as well as violations under state law.

3. I have participated in investigations which identified subjects and co-conspirators through telephone records, police reporting, financial documents, drug ledgers, photographs, and other documents. Furthermore, I have led and participated in investigations concerning the identification of co-conspirators through electronic devices and services: such as, social media platforms, cellphones, and computers. I have also participated in and conducted debriefs of individuals who were arrested and later cooperated with law enforcement. I have participated in investigations in which the court-authorized interception of communications or other electronic surveillance tools were utilized to further the investigation.

4. Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in drug trafficking operations and the unique trafficking patterns employed by a DTO. I know drug traffickers often require the use of a telephone facility (to include various messaging platforms installed on the telephone facility) to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from

the sales of controlled substances. I know that drug traffickers utilize residential and commercial properties to conduct drug trafficking activities, to store drugs and bulk cash, as well as documents. The statements contained within this Affidavit are based in part on information derived from my personal participation in this investigation and through interviews with and analysis of reports submitted by other law enforcement officers. I also base these statements on my experience and background as a Special Agent with the FBI, as well as information provided to me by other law enforcement personnel and on information provided by confidential sources.

5.    The following is based on my own investigation and investigations conducted by other law enforcement agents, including oral and written reports by other law enforcement officers, search warrants in this and other investigations, physical and electronic surveillance, interviews, subpoenaed and public records, database checks, searches, phone analysis, and other investigation and information. Conversations and discussions are set forth below in substance unless otherwise noted. My interpretations of certain statements are set forth following those statements and are based upon my knowledge of this investigation and my training and experience. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of your Affiant's knowledge about this matter.

6.    This Affidavit is made in support of an application for a warrant to

search the premises described as at 920 Locke Street, Salisbury, North Carolina 28144 (the "**Subject Premises**"), which is more fully described in Attachment A, and which located within the Middle District of North Carolina. This Affidavit is based upon information I have gained through this investigation, as well as information from other law enforcement officers and individuals associated with this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that violations of Drug Distribution and Conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846; Use of Communication Facility in Causing or Facilitating the Commission of Felonies Under the Controlled Substances Act, in violation 21 U.S.C. § 843; and Money laundering and conspiracy, in violation of 18 U.S.C. § 1956 ("Target Offenses"), have been or are being committed by Kenneth Thomas Carroll II (hereinafter "CARROLL"), and that that evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing these crimes will be found at and within the **Subject Premises**.

7.     The information contained in this affidavit is provided for the limited purpose of establishing probable cause in support a search warrant for the "**Subject Premises**" described herein and in Attachment A; therefore, I have not included each and every fact known to me concerning this investigation.

## JURISDICTION

8.     A "magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the

district." Fed. R. Crim. P. 41(b)(1). A search and seizure warrant may be "issued for any of the following: (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." Rule 41(c).

## RELEVANT STATUTES

9.     21 U.S.C. § 841(a)(1) states that it shall be "unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

10.     21 U.S.C. § 846 states that "Any person who attempts or conspires to commit any offense...shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

11.     21 U.S.C. § 843(b) states it shall be "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter..."

12.     18 U.S.C. § 1956 as defined by Laundering of monetary instruments.

## FACTS ESTABLISHING PROBABLE CAUSE
## BACKGROUND

13.     The FBI, HSI, ATF, North Carolina State Bureau of Investigation (SBI), Rowan County Sheriff's Office, and Salisbury Police Department are conducting a criminal investigation involving the Salisbury Drug Trafficking Organization (DTO),

which is operating within the Middle District of North Carolina (MDNC) and other areas in the United States. The information herein was derived from several sources, including, but not limited to, CHS statements, controlled purchases conducted with DTO members, surveillance, and wire and electronic intercepts. Investigators also obtained information from police reports, cellular telephone extractions, and other law enforcement agents, and officers who are familiar with the DTO.

14.     The Salisbury DTO is an ongoing criminal enterprise centered in and around the Salisbury, North Carolina area, comprised of Marcus McDaniel, Clarence William West, Kenneth Thomas CARROLL II, and associates; some of whose members have been charged with offenses related to narcotics trafficking. West's criminal history includes a prior federal conviction for drug conspiracy to possess with intent to distribute quantities of cocaine, cocaine base and marijuana; McDaniel's includes a federal conviction in 2005 for distribution of cocaine; and CARROLL's criminal history includes North Carolina convictions in 1992 for possession with intent to sell and deliver cocaine, in 1994 for trafficking in cocaine, in 2003 for felony possession of cocaine, and in 2007 for felony possession of cocaine and habitual felon.

15.     The Salisbury DTO operates as a criminal enterprise with members operating within their own individual groups. Based on CHS reporting, as well as physical and electronic surveillance, the members of these individual groups coordinate with other members to commit the specified Target Offenses. The investigation has revealed, based on initial intelligence received from law enforcement reporting and CHS intelligence, that West and CARROLL hold high

positions within the Salisbury DTO.

16.     In 2022, West, using mobile telephone (704) 232-7104 and (704) 245-5997, was intercepted on a sealed court-authorized Title III wire interception on (980) 353-5442, (704) 724-3188, and (704) 793-3414 belonging to Antoine Turner which was authorized out of the Western District of North Carolina. On June 20, 2022, West and Turner conducted a drug transaction at a QT gas station that was captured on CCTV video surveillance as well as Title III Wire interceptions in the WDNC. On July 17, 2022, West was intercepted on Title III Wire interceptions conducting a kilogram-level cocaine transaction with Turner in Concord, North Carolina.

17.     In October 2022, law enforcement began investigating West and specifically the Salisbury DTO.   Law enforcement used financial analysis, surveillance, pen registers, geo-location data, and CHSs to confirm the Salisbury DTO is engaged in narcotics trafficking and/or money laundering of illegal proceeds. A review of financial accounts identified the following:

18.     West did not have an employment record with the North Carolina Employment Security Commission. West was the President of Ant West LLC which was registered with the North Carolina Secretary of State around September 2017; however, the business was administratively dissolved in 2019 for failure to file annual reports. While no income was identified, the following vehicles were registered to WEST during 2023: 2022 ICON, 2014 Chevrolet SS, 2021 Polaris Slingshot, 2016 Kiri, 2012 Harley Davidson Road Glide, 2015 Chrysler 200, 2019 Chevrolet Silverado, and 2007 Harley Davidson Road Glide. Only the 2019 Chevrolet Silverado had a

lienholder. Additionally, the following residential and commercial properties were owned by West: 337 Scott Road, Salisbury, NC; 313 Scott Road, Salisbury, NC; and 409 S. Long Street, East Spencer, NC. No lienholders were identified for the properties.

19.    CARROLL did not have an employment record with the North Carolina Employment Security Commission. Articles of Incorporation for Pop-a-Top Cash and Carry Inc. were filed in August 2019 with the North Carolina Secretary of State. CARROLL was listed as Vice President. CARROLL was not listed as an officer in the year-end 2020 Annual report. The business was administratively dissolved in February 2023. While no income for CARROLL was identified, the following vehicles were registered to CARROLL: 2010 Hyundai Genesis was registered to CARROLL and the lienholder was OC Easy Riders Inc. and 1995 Freightliner FLD120 with no lienholder listed.

20.    In July 2022, Janeen Byers, who is the girlfriend of Clarence West, and West had a significant domestic altercation. Byers made a police report at Rowan County Sheriff's Office regarding physical abuse by West and other claims. In her statement, Byers stated that West launders his drug money through their shared business Ant's Stop and Shop LLC. Additionally, Byers called the FBI National Threat Operations Center (NTOC) and made a statement under the name Janeen "West", where she reported an incident in which West threatened her. She went on to explain how West lauders drug money through the business.

21.    On June 29, 2023, CHS #1 provided a debrief to investigators regarding

CARROLL. CHS #1 first met CARROLL approximately 15 years ago (approx. 2008) when CHS #1 first began purchasing crack cocaine from CARROLL which continued until approximately 2019. CHS #1 purchased between 0.2 grams and 3.5 grams of crack cocaine from CARROLL as frequently as each day to at least two to three times per week during this period of time. CHS #1 began purchasing methamphetamine from CARROLL around 2019 and continued until 2021. CHS #1 purchased between 0.4 grams to 0.6 grams of methamphetamine from CARROLL every day during this period.

22.     I know a disparity of income reporting is often due to illegal proceeds being combined with legitimate income. I know, based on training and experience, members of a criminal enterprise often use real estate and other assets to launder proceeds of illegal activity. The FBI has identified multiple businesses associated with the Salisbury DTO in the Salisbury area that afford an opportunity for the Salisbury DTO to launder illegal proceeds. West owns a commercial property, Ant's Stop n Shop; CARROLL owns a used car lot and U-Haul rental business.

23.     I believe Salisbury DTO members are continuing to engage in narcotics trafficking based on CHS reporting. CHS #1 reported on August 1, 2023 the following:

24.     CHS #1 started buying from McDaniel when he got out of prison. CHS #1 advised that "Stan" brought McDaniel over to his house where they taught McDaniel how to cook cocaine into crack cocaine. CHS #1 does not know where McDaniel gets his supply of cocaine. CHS #1 provided to investigators the mobile

telephone number that CHS #1 used to contact McDaniel for the purchase of drugs which was (704) 223-8921 ("Target Telephone 1" or "TT1").

25.     CHS #1 said that CARROLL's wife was a woman by the name of Maria. CHS #1 said that Maria previously went to Mexico once a month and that CHS #1 had associates that would travel with Maria from Salisbury, North Carolina to the Mexican border by car with Maria. CHS #1 said that John Leland was one of the drivers during a trip to Mexico. CHS #1 said that Maria and Leland drove to the border with Mexico in a silver Cadillac and that Maria walked over the border, stayed in Mexico for a few hours, and then returned to the United States. Maria and Leland then drove straight back to Salisbury, North Carolina. CHS #1 said that CARROLL "pushes a lot of dope."

26.     I know that traffickers often have different sources of supply to ensure a consistent flow of narcotics and at lower prices. Based on toll records, I know McDaniel, using Target Telephone 1, was in direct communication with West and Carroll, using each as a source of supply during various periods of time. Based on knowledge, training, and experience, DTO members often have specific phones they use to conduct illegal activities with different members and organizations.

## PROBABLE CAUSE

27.     On or about June 23, 2021, a pen register and trap trace, as well as a geo-location search warrant, were issued by the State of North Carolina General Superior Court of Rowan County on (336) 757-9060, a number used by CARROLL. A

review of the geo-location data, or ping location report, received has consistently shown a range of 3/4 mile or more.

28.     On or about July 12, 2023, investigators installed a concealed remote camera in the vicinity of 602 South Main Street, Salisbury, North Carolina, which is a commercial property operated by CARROLL. The camera is in position to show external activity on the sides of the commercial and part of the parking lot.

29.     On or about July 24, 2023, Salisbury Police Department responded to an emergency call for service at the **Subject Premises** for a reported drug overdose. Upon arrival, Officers observed Rowan County Fire and EMS administering aid to Eric James Howard who had apparently overdosed on an unknown narcotic. EMS administered 4mg of Narcan to Howard who was then transported to Novant Health Medical Center in Salisbury, North Carolina.

30.     On or about October 5, 2023, investigators installed a concealed remote camera in the vicinity of the **Subject Premises** and 917 Locke Street, Salisbury, North Carolina, which are properties operated by CARROLL. The camera is in position to show external activity of both properties from the road.



31.     On November 2, 2023, Chief United States District Judge Catherine C. Eagles signed an initial Order for Geolocation and Title III Interception of Wire Communications in the Middle District of North Carolina for (336) 757-9060 ("Target Telephone 3" or "TT3") a telephone number used by CARROLL.

32.     On November 11, 2023, FBI observed on CCTV video surveillance drug trafficking activity at **917 Locke Street**. At approximately 2:07 p.m., G. S. was observed arriving at **917 Locke Street** in his Ford SUV and parking in the street. At approximately 2:17 p.m., G. S. is observed exiting the vehicle and walking into **917 Locke Street**. At approximately 2:20 p.m., G. S. is observed exiting **917 Locke Street**, walking to his vehicle and departing.

33.     On November 12, 2023, FBI observed on CCTV video surveillance drug trafficking activity at **917 Locke Street**. At approximately 5:22 p.m., G. S. was observed arriving at **917 Locke Street** in his Ford SUV and parking in the street. A black male, known to investigators as "Curt" was observed exiting the vehicle from

the passenger side and entering **917 Locke Street**. At approximately 5:29 p.m., "Curt" was observed walking from **917 Locke Street** to G. S.'s vehicle and entering the passenger compartment. The SUV was then observed departing the area. Based upon my training and experience, I believe that observation of "short-stays" at residences known for drug trafficking are indicative of drug transactions.

34. On November 13, 2023, FBI observed on CCTV video surveillance drug trafficking activity at **917 Locke Street**. At approximately 3:06 p.m., G. S. was observed arriving at **917 Locke Street** in his Ford SUV and parking in the street. G. S. was observed exiting his vehicle and walking into the **917 Locke Street**. G. S. was then observed outside **917 Locke Street** with "Curt" before eventually returning to his vehicle and departing.

35. On or about November 21, 2023, B.H. was arrested by Salisbury Police Department after a traffic stop for possession of crack cocaine. B.H. was provided his Miranda Rights but agreed to waive his rights and to provide an interview to Detectives Miller and Dishman. The following dialogue was recorded during the interview of B.H., much of which was corroborated by investigative intelligence including but not limited to physical and CCTV video surveillance:

> MILLER: "Throw me something about Jody that I don't know."
>
> B.H.: "Okay. The business is just a front."
>
> MILLER: "Um huh."
>
> B.H.: "It's a multi-million dollar enterprise as far as drugs."
>
> MILLER: "Okay."

B.H.: "He got it like that. I say he got it like that. He got it like that. He supply a whole lot of people. Then okay. Locke Street."

MILLER: "Okay."

B.H.: "You know anything about Locke Street?"

MILLER: "Uh. Is that the one behind Salisbury High School?"

B.H.: "The apartments."

MILLER: "Uh, I don't know. I just know where it at."

B.H.: "The apartments."

MILLER: "No. just Locke Street."

B.H.: "You?"

DISHMAN: "Yeah."

B.H.: "The white apartments. He got some on the right side and the left side. That's if you coming down Thomas Street and turn on Locke Street. The ones on the left hand side. He renting them out. There is two rooms. He's renting them out for a hundred dollars a piece. Katie (sp) staying in one and a black girl stay in the other one. Okay. That's where he cook at."

MILLER: "On Locke Street?"

B.H.: "Um huh. That's where he cooks all his drugs at. Then he got one across the street. It's uh. His brother stay in one of them. Uh, Keith. He drives a truck."

MILLER: "Yeah. I know Keith."

B.H.: "The other one right there is empty. See what I'm saying. A lot of times that's where the old man Curt stays at."

MILLER: "That's where Curt stays at sometimes?"

B.H.: "Yeah, he stay there. But he been at the shop for the last two months."

MILLER: "Okay."

B.H.: "Okay. But on Locke Street the apartments right there. If you. If you ride by it any kind of way you stop. It's a black girl. She on so bad, she stay in one of them. She pull the whole damn sheet back looking out. That's how bad she on it. And every time somebody come she standing there with her hand out."

MILLER: "Well, let me ask you this. If he, if the shop is a front and he cooks on Locke where does he keep it? Where do you think he may keep it?"

B.H.: "I'm going to be honest man. I'm telling you the truth. I've been telling the truth from the beginning. Different places. Different places."

MILLER: "Yeah."

B.H.: "Like Locke Street. Let me be over that way right there on the side of the apartment, there are steps on the side. There are trash cans right there. Keep shit in that trash can, then up at the shop. It different places. Sometime in one of the U-Haul."

MILLER: "Yeah."

36.     On December 12, 2023, G. S. was interviewed at the Rowan County Rescue Squad located at 1140 Julian Road, Salisbury, North Carolina. The following information was provided:

37.     SA Pupillo provided G. S. with a series of numbered photographs. G. S. affirmed that in Photo 1 he recognized the vehicle and advised that it was his Ford SUV and that he recognized himself in the photograph as well.

38.     Photo 1 (Recorded on November 11, 2023, at 2:07 p.m.):



39.     Photo 2 (Recorded on November 11, 2023, at 4:31 p.m.):



40.     G. S. stated that he was there to buy drugs from "Jody" Carroll. G. S. pointed to Photo 3 and stated that "Jody" owns that house on Locke Street. G. S. said that there were two units (one on the right and one on the left) and that "Jody" keeps his drugs in the unit on the right. He said that in that unit on the right, "Jody" has a black female that G. S. believed might have HIV/AIDS living there in one of the bedrooms. G. S. says that she pays "Jody" her monthly government assistance check and that she in turn gets crack cocaine for watching the place. G. S. said he was last inside the unit approximately two months prior, and that "Jody" had offered him to the other bedroom in exchange for rent. G. S. could not tell investigators what house number was given to the property. [Note: The property is known to investigators as 917 Locke Street, Salisbury, North Carolina.]

41.     Photo 3 (Note: 917 Locke Street):



42.     G. S. was provided a photograph of Kenneth Thomas CARROLL II (hereinafter "CARROLL"). G. S. advised that the person in the photograph was "Jody" and the same person he was previously referencing.

43.     G. S. stated that CARROLL was keeping the crack cocaine in a metal container, and he had asked G. S. to let him know after he smoked it whether it tasted like the metal container. G. S. said CARROLL wanted to know if the crack tasted like metal. G. S. advised that it did not. G. S. said that he had seen the metal containers while he was inside 917 Locke Street. He described them as looking similar to the cylinders used at banks in the drive through line. He said that CARROLL would keep the drugs stuffed solid in the metal cylinders and that the ends were bolted down with eight bolts on either end. G. S. agreed they would look similar to large "pipe bombs."

44.     G. S. advised that CARROLL sells to him an eight-ball of crack cocaine

for $125, and that CARROLL has offered him powder cocaine at $25 per gram, although G. S. admits he mostly uses crack cocaine.

45. G. S. referenced Photo 1 and stated that he would park in front of 917 Locke Street and wait for either CARROLL or "Curt" to arrive with the drugs that he had ordered. G. S. described "Curt" as a black male with grey hair that sells for CARROLL. G. S. said that sometimes the "dope" is in front of 917 Locke Street in the trash can hidden in some waste like a used Bojangles cup. G. S. pointed to the "blue" municipal trash cans in Photo 1 and advised that recently they are closer to the front porch. G. S. stated other times, CARROLL will go inside the right unit (G. S. pointed at the unit door on the photo) at 917 Locke Street to get the drugs. He said he has even seen G. S. walk inside the front door and then exit the rear right side door and go around back of the property where he has it hidden in the yard or in the basement. G. S. stated that approximately three to four months ago, he was inside the right unit at 917 Locke Street with CARROLL who was handling a "big chunk of fentanyl" using cooking tongs and trying to break it into smaller pieces by slamming it on the kitchen counter.

46. G. S. advised that in all of the photos he was buying crack cocaine from CARROLL or one of CARROLL's dealers like "Curt." He said that he buys crack cocaine from CARROLL at $20 to $40 per deal. G. S. said that two weeks ago, CARROLL asked G. S. if he had anyone that wanted to buy fentanyl, and that CARROLL would give him a cut to move (sell) his fentanyl for him.

47.  G. S.  stated that recently, with CARROLL concerned about law enforcement, he has had "Curt" handle the crack cocaine sales and CARROLL handles the fentanyl deals. G. S.  said that CARROLL calls fentanyl "dog food" and that CARROLL has told him that he delivers dog food for a living. G. S.  reported that CARROLL's fentanyl recently has been a yellowish or "buttery" color. G. S.  advised that CARROLL carries "Narcan" with him to administer to any of his customers that "OD" on his fentanyl. G. S.  described an event during which he was present during an overdose that CARROLL used Narcan to resuscitate the drug user.

48.  G. S.  was shown Photo 5. He stated that the property in the photo was also on Locke Street although he didn't know the number and that it was owned by CARROLL. [Note: The property is known to investigators as 920 Locke Street, Salisbury, North Carolina, hereinafter "**Subject Premises**."]

49.  **Photo 5 (Note: 920 Locke Street "Subject Premises"):**



50.  G. S.  advised that he was at the **Subject Premises** the night prior to buy crack cocaine, and that he went inside to conduct the deal. He said that he told

CARROLL he wanted a $10 piece, but he only had a five-dollar bill in his pocket so CARROLL would only give him $5 worth of crack cocaine. G. S. said that the hand-to-hand transaction was with a new "white guy" that was working for CARROLL. G. S. said the right unit in the duplex is empty and that CARROLL is renovating it. He said that sometimes CARROLL's "men" or "workers" crash the night at the **Subject Premises**.

51.     G. S. said that he usually gets something between a $40 to $60 crack rock from the **Subject Premises** when he goes there. G. S. reported that he has bought from this location at least ten times recently, and that each time he goes inside. He described it as a one-bedroom unit, with no occupants other that the occasional "worker", no children or dogs, and no security system. He also stated there was no current furniture other than a refrigerator that CARROLL recently installed.

52.     G. S. stated that the drugs are usually already on the inside of the **Subject Premises**; however, if they are out of supply CARROLL will get on a bicycle and ride around the corner to either his mom's house or some other stash location CARROLL has. G. S. said that CARROLL has recently upgraded to an electric bike, which G. S. has seen him on at least twice.

53.     G. S. was unaware of who lived in the other unit at the **Subject Premises**. He was unaware of any firearms that CARROLL might have in his properties and had never seen him in possession of a firearm. He did advise that CARROLL has patted him down before letting him into his properties to see if G. S. was wearing a body wire.

54.   G. S. was shown a photograph of Curt Scott, date of birth 03/28/1965 and confirmed that the person in the photograph was the "Curt" that he had previously been referencing (hereinafter "SCOTT"). G. S. stated that SCOTT had to write down all of the drug transactions that he does in a ledger or journal and that he has to report it back to CARROLL, and that SCOTT has to use scales to divide drugs up. He said CARROLL doesn't do this for his own transactions though, and that CARROLL simply breaks off pieces that he "eyes" as close to the weight.

55.   On December 23, 2023, FBI observed on CCTV video surveillance a drug trafficking activity at **Subject Premises**. At approximately 6:08 p.m., a maroon minivan arrived at the **Subject Premises**. An unknown white male (UM 1) exited the vehicle from the driver's compartment and walked inside the **Subject Premises** with what appeared to be an unknown item in his right hand. At approximately 6:08 p.m., CARROLL was observed exiting his dark grey Honda Accord that was parked in the driveway of the **Subject Premises** prior to the arrival of the maroon minivan. CARROLL was observed exiting the vehicle and then entering the **Subject Premises**. At approximately 6:09 p.m., CARROLL was observed exiting the **Subject Premises** along with Curt SCOTT. CARROL was observed opening the driver's compartment of the dark grey Honda Accord and conducting an unknown activity within the vehicle while still standing outside. SCOTT was observed walking from the **Subject Premises** and to 917 Locke Street and entering the residence. At approximately 6:10 p.m., the UM 1 was observed exiting the **Subject Premises** and opening the passenger door to the minivan. UM 1 appeared to be talking with an

unknown passenger within the minivan. At approximately 6:08 p.m., CARROLL was observed entering the Honda Accord and departing in the direction of Old Plank Road. UM 1 was observed pacing in the front of the **Subject Premises** apparently waiting for CARROLL to return. At approximately 6:13 p.m., CARROLL was observed returning to the **Subject Premises** and parking the Honda Accord in the driveway. He was observed exiting the vehicle and then he and UM 1 are seen walking into the **Subject Premises**. At approximately 6:16 p.m., UM 1 was observed departing the **Subject Premises** and entering the minivan. The minivan then was seen leaving the area. CARROLL was then observed exiting the **Subject Premises** and then appeared to take a video of the Honda Accord using his mobile phone. CARROLL then was seen entering the Honda Accord and utilizing his mobile phone inside the vehicle.

56.     On or about January 1, 2024, at approximately 12:50 a.m., an unknown male (UM 2) was observed by CCTV video surveillance with a bicycle on the front porch area after having exited the **Subject Premises**. UM 2 was observed walking to the road with the bicycle while looking at a cell phone in his hand. At approximately 12:53 a.m., a black sedan arrives at the **Subject Premises**. At approximately 12:59 a.m., an individual known by the affiant as G. S. exited the black sedan vehicle and was observed walking to the side of the Subject Premises to UM 2. A conversation between the two was observed. At approximately 1:00 a.m., G. S. was observed walking away from the individual with the bicycle looking at his hand. G.S. re-entered the black sedan. UM 2 was then observed entering the **Subject Premises**

from the side entrance, then moments later exiting again and walking to the passenger side of the vehicle G. S. was waiting in. A conversation was observed, and then UM 2 walked back to the **Subject Premises** and entered. At approximately 1:03 a.m., the UM 1 walked out of the **Subject Premises** with both hand in his coat pockets. UM 2 walked to the passenger window and puts his right hand on the door where the window appears down. There was a brief exchange and then UM 2 returned to the **Subject Premises**. At approximately 1:07 a.m., G. S. was seen leaving the area in his dark sedan.

57.     Based upon my training and experience, I believe that CARROLL is utilizing the **Subject Premises** as well as other locations within the area to conduct drug transactions using subordinate members of his drug trafficking organization as detailed in interviews with G.S and B. H. described within. UM 2, believed to be Curt SCOTT, was observed conducting drug trafficking activities at the request of CARROLL at the **Subject Premises**. By G.S.'s own admission, he only goes to the **Subject Premises** for the purposes of buying crack cocaine from CARROLL.

58.     Based upon my training and experience, I believe that CARROLL is trafficking fentanyl and crack cocaine from **Subject Premises** as well as **917 Locke Street both** of which CARROLL maintains and controls. CARROLL is also utilizing his communication facility in order to coordinate the drug transactions. Based upon the interception of pen register and geolocation data, CHS reporting, CCTV video, and Title III wire interceptions, between January 2023 and the present time, I believe that CARROLL has and continues to conduct drug transactions from the **Subject**

Premises.

## TECHNICAL TERMS

59.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital

cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain

records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing

documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly

from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

60. Based on my knowledge, training, and experience, I know that electronic devices, including computers, laptops, cellular telephones, and smartphones, can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

61. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the CELL PHONE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the CELL PHONE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

62. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of CELL PHONES device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

63. *Manner of execution.* The search of any CELL PHONE seized pursuant to this warrant will be conducted within a reasonable time and without unreasonable delay.

## CONCLUSION

63. Based on the above, your Affiant has probable cause to believe that Kenneth Thomas CARROLL II is trafficking cocaine from 920 Locke Street, Salisbury, North Carolina. CARROLL is also utilizing his communication facility in order to coordinate the drug transactions. Based upon the interception of pen register and geolocation data, CCTV video, CHS reporting, and Title III wire interceptions, between January 2023 and the present time, I believe that CARROLL has and continues to conduct drug transactions at 920 Locke Street, Salisbury, North Carolina.

64. Based on the aforementioned factual information, your Affiant

respectfully submits there is probable cause to believe that evidence of these crimes, contraband, fruits of these crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing these crimes, which is more fully described in Attachment B, will be found at and within the **Subject Premises** described in Attachment A.

65. Based on the forgoing, your Affiant requests that the Court issue the proposed search warrant.

Respectfully submitted,

/s/ Chad Pupillo by WPA

Chad Pupillo
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this _____ day of January, 2024, at ____ a.m./p.m.

L. Patrick Auld
Magistrate Judge
United States District Court